NOTICE

Decision filed 08/09/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200047-U

NO. 5-20-0047

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 18-CF-276 |
| | ) | |
| TROYT A. COX, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's conviction for driving with a revoked license is affirmed where the trial court complied with *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, where the defendant was not denied his right to counsel during posttrial proceedings, and where the court properly found that his *pro se* allegations of ineffective assistance of counsel did not require the appointment of new counsel.

¶ 2    This is a direct appeal from the circuit court of Effingham County. The defendant, Troyt A. Cox, was convicted of driving with a revoked license. On December 6, 2019, he was sentenced to 30 months of conditional discharge and 180 days in jail. On appeal, the defendant argues that the trial court's failure to comply with *People v. Krankel*, 102 Ill. 2d 181 (1984), deprived him of his constitutional right to counsel at critical posttrial stages of his case. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On July 20, 2018, the defendant was charged by information with a second or subsequent offense of driving while his license was revoked, a Class 4 felony (625 ILCS 5/6-303(a), (d) (West 2018)). A superseding indictment was subsequently filed. On July 30, 2018, the trial court informed the defendant of the charge against him and explained that Class 4 felonies were punishable by one to three years in prison or up to 30 months of probation or conditional discharge. At a hearing held the following day, the defendant indicated that he did not intend to seek private counsel at that time, and he wished to have the court appoint counsel for him. The court then appointed the public defender's office to represent him. Public defender Scott Schmidt, who was representing the defendant on another matter, appeared with the defendant at this hearing.

¶ 5      At a pretrial hearing on November 15, 2018, public defender Schmidt indicated that if the case proceeded to trial, he would assign public defender Janet Fowler as the defendant's counsel. Prior to trial, defense counsel filed a motion *in limine* to preclude the State from using, for impeachment purposes, the defendant's prior felony conviction for driving while his license was revoked. Counsel also filed a motion *in limine* to preclude the State from introducing into evidence the defendant's statement to police that he had been arrested for the "same offense 'multiple times.'" Both motions were granted.

¶ 6      On November 26, 2018, the defendant's jury trial commenced. The defendant was represented by public defender Fowler. Following jury selection, the jurors were released for the day with the presentation of evidence to begin the following day.

¶ 7      On November 27, 2018, the defendant filed a *pro se* motion to vacate judgment and reopen Effingham County case No. 10-CF-176 pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). The motion challenged his conviction on numerous grounds,

and he requested that a copy of the motion be included in the record in the present case (Effingham County case No. 18-CF-276). When the trial in this case resumed, the parties met in chambers to discuss an inappropriate comment one of the selected jurors made to another juror. The court removed the juror who made the comment for cause; the juror to whom he was speaking was questioned by the court, assured the court that she was not affected by the comment, and remained on the jury over defense counsel's objection.

¶ 8    Thereafter, Officer Andy Warner of the Effingham Police Department testified that he conducted a traffic stop at the Amtrak station parking lot at around 7 p.m. on June 28, 2018. Warner explained that he had been parked in a lot near Fayette Avenue and Fourth Street in Effingham, observing traffic. Warner saw a Chrysler Sebring drive past with its passenger side tires driving "on top of and over the center lane divider." On cross-examination, Warner clarified that the driver committed improper lane usage by "straddling" the "white broken line" and by driving into "the other lane." Warner began following the vehicle as it proceeded south on Banker Street from Fayette Avenue. He could see that the driver was a white male wearing a bright orange shirt, and he did not see any other occupants. Warner tried to position his vehicle behind the Chrysler, but due to traffic, he became stuck in another lane when the Chrysler turned onto an access road and drove toward the Amtrak parking lot. Warner had to do a U-turn to get behind the vehicle.

¶ 9    Warner activated his lights as the vehicle was parking in the Amtrak lot. When he approached the driver's side of the vehicle and started to speak, he noticed that the driver's seat was empty and the male he had just seen driving was sitting in the passenger seat. Warner stated that the man in the passenger seat was the defendant, confirmed that he saw the defendant driving, and identified him in court. When Warner asked the defendant why he changed seats, the

3

defendant initially said he "was always seated in that seat." After Warner explained that he saw the defendant driving, he apologized for lying and said, "he knew *** he didn't have a valid driver's license." Warner confirmed with dispatch that the defendant's license had been revoked and placed him under arrest.

¶ 10    People's Exhibit 6, a video of the traffic stop, was admitted into evidence and played for the jury. Warner explained that his squad car recorded video and audio of the stop; the recording system activated automatically when he turned his lights or siren on, or it could be manually started. Warner also explained that the system "continuously records but doesn't save it. So when we activate our lights or turn on the recording actually goes back and starts 30 seconds prior to the activation."

¶ 11    According to the timestamp, the video of the traffic stop started at 7:42 p.m. and showed Warner's vehicle turning onto a small road leading to a parking lot. A light grey passenger car can be seen driving in front of Warner's squad car and turning into a parking lot area, with the vehicle disappearing from the camera's view momentarily behind other cars in the lot. The video showed the squad car parking behind a light grey car, and Warner approaching the vehicle. Warner asked, "Why are you sitting over there?" The defendant appeared to say that he had been there "the whole time," but the response was difficult to hear due to a dog barking and music playing. Warner responded, "Oh my God," before radioing for assistance and telling the defendant, "You need to rethink this, sir."

¶ 12    Warner told the defendant that he was "being silly," and that Warner saw him driving. After giving dispatch the license plate number for the "silver Sebring," Warner informed dispatch that the defendant had just "hopped into the passenger seat." Warner explained to the defendant that he saw him drive past in his "bright orange shirt" and saw him drive "on the center line a little

4

bit." Warner said he thought the defendant might be going to the Amtrak station or might be "ducking on" him. Warner said he stopped the car for the lane violation and to make sure the defendant had not been drinking and driving. The defendant can be heard saying, "my license," but the rest of his comment was difficult to hear due to the music playing. Warner asked the defendant if his license was revoked, and he responded, "Yeah, yeah, I'm revoked. Got two [inaudible]." Warner asked for identification and explained that he did not know the defendant. The defendant responded that his license was revoked "forever," and he had tried unsuccessfully to get his license back. Ultimately, the defendant exited the vehicle, confirmed his name, and was handcuffed and taken into custody.

¶ 13    After the video was played for the jury, the State asked the trial court to take judicial notice of People's Exhibit 2, an unredacted form of the defendant's driving abstract, and the State published People's Exhibit 3, a redacted version of the driving abstract to the jury. At this point, the State rested its case.

¶ 14    After the State rested, defense counsel moved for a mistrial, arguing that the video violated the defendant's motion *in limine* because the statement that he "hadn't had his driver's license for forever" referred "back somewhat to the having *** multiple similar offenses in the past." The trial court denied the motion for mistrial as well as the defendant's motion for directed verdict. The defendant did not testify or present any evidence in his defense. Thereafter, the jury found the defendant guilty of driving while his license was revoked.

¶ 15    On December 7, 2018, defense counsel filed a motion for a new trial alleging that the State failed to prove the defendant guilty beyond a reasonable doubt, the State failed to prove that he was operating a motor vehicle on a roadway, and the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*.

5

¶ 16    On January 11, 2019, the defendant filed a *pro se* "motion to vacate judgment/stay enforcement and request for a new trial." Relevant to this appeal, the motion asserted that the defendant's case was assigned to public defender Fowler shortly before trial; the defendant only met with her for approximately 15 minutes prior to trial; she was ineffective for failing to file a motion to suppress the evidence from the traffic stop; the traffic stop was illegal; Warner gave false testimony; and there were no white lines on the road where Warner claimed there to be.

¶ 17    On January 14, 2019, the defendant filed a *pro se* motion to suppress evidence. The defendant claimed the motion could not have been filed sooner due to ineffective assistance of counsel, and he argued the traffic stop was unlawful and Warner stopped him based on a hunch. In a motion to continue filed on the same date, the defendant maintained that a continuance was necessary for the trial court to rule on the motion to vacate in case No. 10-CF-176 and the motion to suppress in this case (case No. 18-CF-276).

¶ 18    At the January 16, 2019, hearing, the defendant appeared with public defender Fowler. The trial court stated that there had been "a number of motions filed" by the defendant *pro se* and explained that it was "generally not obligated to entertain any *pro se* motions at a time that the Defendant is represented by counsel." However, the court noted that it needed to determine whether the defendant's filings would give rise to a *Krankel* hearing. The court explained that before it proceeded, it needed to ask the defendant if he still wished to be represented by the public defender in this case and other pending cases. The court advised that the defendant had a right to an attorney and to have one appointed if he could not afford one, and it noted that the public defender had been previously appointed. The court again said the defendant's posttrial motions "seem to suggest the possibility of ineffective assistance of counsel" and asked, "Again, Mr. Cox,

do you wish to be represented by either a private attorney or the Public Defender's Office further in these matters?" The defendant answered, "Public attorney, Your Honor."

¶ 19　The trial court asked how he had been able to post bond, and the defendant said his family helped him. The court found the case could not proceed to sentencing until the posttrial motions were resolved and scheduled a status hearing on the motions. Fowler informed the court, "That's fine, but Mr. Cox said he wanted private counsel at this point." The following exchange then occurred:

> "THE COURT: I misheard that and I apologize. Let me ask again, do you no longer wish to be represented by the Public Defender's Office?
> [THE DEFENDANT]: No, sir, I don't.
> THE COURT: Is it your intention then to represent yourself going forward or to hire private counsel?
> [THE DEFENDANT]: My intention is to hire private counsel, but I would also like to ask the Public Defender to give me any discovery and any—
> THE COURT: Well at some, at such time as you hire counsel, the Court will require the Public Defender to provide any and all discovery material or in the case of 18-CF-276, the entire contents of his file. Are you asking that the appointment of the Public Defender be vacated at this time?
> [THE DEFENDANT]: Yes, sir, I am."

¶ 20　At that juncture, the trial court vacated the appointment of the public defender's office as the defendant's counsel. The court confirmed the defendant's understanding that the next step in the procedure would be sentencing on a Class 4 felony. The court set a status hearing and told Fowler that she would be notified if a *Krankel* hearing occurred.

¶ 21　Pursuant to the defendant's prior motion to continue, the trial court next addressed his motion to vacate judgment filed in case No. 10-CF-176. At a hearing on April 11, 2019, the defendant appeared *pro se* and argued in support of the motion. The court took the matter under advisement and later denied the motion during a hearing on May 13, 2019. Also at the May 13 hearing, the court again asked the defendant if he intended to represent himself until the conclusion of the present case (No. 18-CF-276), and he responded in the affirmative. The court asked if,

going forward, the defendant intended to hire private counsel or represent himself. He responded that he would represent himself. The court set a hearing for July 19 to address the defendant's motion for new trial and sentencing.

¶ 22　On August 12, 2019, the defendant filed an "amendment to motion for new trial/motion to dismiss indictment," which alleged, in part, that he received ineffective assistance of counsel. At a hearing held on that date, the trial court explained that the parties were present for sentencing. The court asked the defendant if he was "prepared to go forward today on [his] sentencing hearing on [his] own behalf without the assistance of either a privately-retained or court-appointed attorney?" He responded, "Your Honor, not until we—we can go ahead and hear the motions that are still pending." The court said:

> "I need to know whether you wish to be represented by an attorney or whether you're planning to—you're going to persist in your waiver and represent yourself? And we'll address all of your motions here today. How do you wish—are you waiving your right to an attorney?"

The defendant once again confirmed that he was waiving his right to an attorney.

¶ 23　When the trial court asked which posttrial motions the defendant wanted to address, he addressed his *pro se* motion to suppress filed after trial and asserted that "the Public Defender failed to bring up any of that in the trial." The court denied the motion, explaining that a motion to suppress must be filed prior to trial, the "ship [had] sailed with respect to motions to suppress evidence," and it was "not a proper posttrial motion." The defendant next discussed his *pro se* motion to vacate judgment and stay enforcement filed in this case on January 11, 2019. The defendant argued, *inter alia*, that Warner gave false testimony at trial. The State responded that the issues raised should have been addressed prior to or at trial. The court agreed and denied the motion. After the defendant discussed some additional matters, the court explained that the posttrial motions had been denied, and the case would proceed to sentencing.

8

¶ 24 The trial court allowed the defendant to explain his objections to the presentence investigation report (PSI) and to correct any errors. The court later observed that his posttrial claims were challenging "certain trial strategies" and "challenging the sufficiency of [his] legal counsel during the trial." The defendant confirmed that he was. The court determined it would allow the State to present its sentencing evidence, have the PSI updated, and then adjourn for further proceedings. The court explained:

> "the Court is going to consider whether or not the matters raised in some of the posttrial motions rise to the level of a *Krankel* issue, a *pro se Krankel* issue. What that means is *** whether or not it's considered a *pro se* motion raising posttrial presentencing the ineffective assistance of counsel. The Court has to make a preliminary finding or consideration to which you may or may not be entitled to a hearing under [*Krankel*], but the Court is going to take that time to do so."

After the State presented its sentencing evidence, the court advised that it would "hopefully before the 27th make any determinations with respect to its *Krankel* analysis with respect to the motion— the matters raised as to ineffective assistance of counsel." The docket entry entered after this hearing also said the court would consider whether *Krankel* applied.

¶ 25 On August 27, 2019, the defendant filed a *pro se* motion entitled "ineffective assistance of counsel," which argued, *inter alia*, that counsel "failed to bring any defense to the case whatsoever," failed to "effectively cross examine Officer Warner," and failed to file a motion to suppress "regarding the unconstitutional traffic stop." At the August 27 hearing, the trial court explained that it had not reviewed the motion filed on that day or had the opportunity to give further thought to whether it would grant a preliminary hearing on the defendant's *pro se Krankel* motion. The court scheduled a final status hearing for September 6 and explained that it would rule on the *Krankel* issue on that date.

¶ 26 In a docket entry entered on September 5, 2019, the trial court stated that it found the defendant's *pro se* ineffective assistance of counsel claims had "merit, ostensibly and superficially,

9

to justify a preliminary, non-adversarial, hearing" about the allegations. Further, the court intended to "schedule such preliminary hearing on the Defendant's posttrial motion pursuant to *Krankel*, *supra*, and shall inquire, again, of the Defendant as to his wish to be represented by counsel, private or court appointed." The docket entry for September 6 indicated that the court set the *Krankel* hearing for October 18, 2019, at 1 p.m.

¶ 27 At the October 18, 2019, hearing, the trial court explained that it would be conducting an "initial inquiry" into the defendant's *pro se* ineffective assistance of counsel motion filed on August 27, 2019. The court explained:

"The Court having reviewed that *pro se* motion determined that it had an initial duty to conduct what is referred to as a *Krankel* investigation, rather, into the allegations of ineffective assistance of counsel. That's specifically pursuant to case [*Krankel*, 102 Ill. 2d 181] decision, together with its progeny of cases.
    This hearing that we are about to hear is non-adversarial in nature. What that means is there will not be questions and answers posed to each other. Rather the inquiry will be limited to the Court asking questions of Mr. Cox and of his trial attorney, Ms. Fowler, as they relate to Mr. Cox's motion.
    The state, while present representing the people, will not engage in cross examination either. And at the conclusion, the Court will conduct a *Krankel* analysis, also in light of the case [*Strickland v. Washington*, 466 U.S. 668 (1984)] which is the seminal case that deals with the claim of ineffective assistance of counsel."

¶ 28 When asked if he had any questions, the defendant said no. The trial court told the defendant to explain his claims of ineffective assistance, and the defendant said, "Your Honor, according to your previous ruling, you already found that the claims had merit?" The court responded:

"The claims have merit to engage in a *Krankel* hearing; that's what we are conducting today. I made no determination as to the merits. They have a *prima facie*—they raise issues of constitutional—constitutionality, and that's what this hearing is to determine to make a determination of whether or not your motion for a new trial based upon ineffective assistance of counsel should be granted or denied."

¶ 29 The trial court again directed the defendant to argue his ineffective assistance allegations. The court asked the defendant what defense he believed his trial counsel should have raised, and

10

he responded that he did not know "what the proper defense was for that." When the defendant explained that he "wasn't ready for this type of hearing today," the court asked why he was not ready, and the following exchange occurred:

> "THE DEFENDANT: Because the docket showed that we were having a preliminary hearing just to decide whether you were going to appoint counsel to— appoint—or give me a chance to get counsel.
> THE COURT: Well, if the Court were to find some merit, the next inquiry would be whether or not you do wish to be represented by an attorney. Do you wish to be represented by an attorney, court appointed attorney?
> THE DEFENDANT: Depending on who the court appointed attorney would be, Your Honor.
> THE COURT: Well, no. You don't have a right to pick your attorney. You can hire a private attorney.
> THE DEFENDANT: Yeah, yeah. Right. I understand."

¶ 30    The trial court reiterated that the defendant could hire any private attorney, as he had posted bond "time and time again." The court told the defendant that it would give him the opportunity to hire an attorney if he wished to do so. The court asked the defendant if he wanted to be represented by a court appointed attorney. The defendant declined private or appointed counsel and said that he planned to represent himself.

¶ 31    When the trial court again asked what defense should have been raised, the defendant argued that the traffic stop lacked probable cause. The court asked whether there were any "simple defenses, referred to sometimes as affirmative defense," that should have been raised, and the defendant responded, "I don't know the proper defense for that because I'm not an attorney." In response to the allegation, trial counsel explained that because Warner observed a traffic violation and the defendant confessed to driving, she did not believe a defense was available.

¶ 32    The defendant argued that the traffic stop was unconstitutional because the "police report didn't match the DVD." Although the police report said Warner initiated the stop because the defendant crossed the center line two times, the defendant asserted, "In one part of it, it said it was

11

on a part of a road that doesn't even have a center line and turned left—I can't remember off the top of my head—turned left onto Banker Street and the tire crossed the center line, which there is no center line." The defendant maintained that "there was no real reason to pull [him] over." Trial counsel responded:

> "I didn't think—I think it was fairly clear that the officer observed what he observed, that he did swerve into—go into the other lane slightly. I didn't think it would—I didn't think a motion to suppress would be available there. I didn't think that there was—even though it was close and I questioned Officer Warner at trial, I did not think that I would succeed on a motion to suppress, given my experience in similar types of cases with that scenario of the proper lane usage type cases. I did not think that that was going to succeed."

Counsel later recalled that the police report indicated there was "some sort of white line in the middle of the road," which contributed to her decision to not file a motion to suppress.

¶ 33 The defendant argued that counsel ineffectively cross-examined Warner. In support, he said Warner only pulled him over because he assumed he was trying to avoid police contact and that was not a valid basis for a traffic stop. Trial counsel acknowledged that the video did not show the defendant's driving at the time of the alleged violation, but she believed that she cross-examined Warner sufficiently as to his observations of the defendant's driving. The hearing proceeded with the defendant arguing in support of his additional ineffective assistance claims and counsel explaining the actions taken.

¶ 34 At the conclusion of the discussion as to the defendant's claims, the trial court explained it had considered the defendant's motion and "conducted an initial inquiry" pursuant to *Krankel*. The court stated it was considering the claims in light of *Strickland*. Next, the court explained:

> "The Court has given the defendant an opportunity to elaborate on the various challenges that he has to the effectiveness of [trial counsel]. The Court, having reviewed that and having afforded both [the defendant and trial counsel the opportunity] to comment, finds that the matters raised are either—well, either do not raise constitutional issues or do not—did not prejudice the defendant in the presentation of his defense, or involves simply matters of trial strategy. The Court went to great lengths to protect Mr. Cox's rights when

12

issues were brought to the Court's attention. And it is the Court's estimation that [trial counsel] did likewise."

The court denied the defendant's *pro se* motion alleging ineffective assistance of counsel. The court scheduled the case for sentencing and explained the defendant could present argument in support of the motion for a new trial filed by trial counsel at that hearing. The court further explained that the defendant still had a right to an attorney, and he could hire counsel or request that the court appoint counsel to represent him at that hearing.

¶ 35 On November 1, 2019, the defendant filed a *pro se* "objection to and motion to reconsider '*Krankel*' hearing." In that motion, the defendant argued the trial court's September 5 docket entry demonstrated that the court found his claims had merit, the court did not need to hold a preliminary hearing, he was not prepared to argue the merits of his claims at the October 18 hearing, the court should have appointed counsel to represent him on those claims, and the court erred on October 18 by deciding the ultimate question of whether counsel was ineffective. The defendant maintained that he believed the court was evaluating his claims for potential merit, and he was prejudiced because he did not have counsel to help him argue his claims. On December 6, 2019, he filed a motion for new trial arguing, among other things, that the traffic stop was illegal.

¶ 36 At the December 6, 2019, sentencing hearing, the defendant appeared *pro se*. He argued that the *Krankel* procedure was done incorrectly, and the only issue that should have been determined was whether counsel should be appointed. The trial court responded:

> "The Court does recall spending a good deal of time reviewing the *Krankel* case and the procedure set out in that and the progeny of cases that followed that. It was to have been conducted as an [*sic*] nonadversarial proceeding. The former attorney for Mr. Cox was present and was subjected to questions by the Court. Mr. Cox was given opportunity to make his arguments and the Court felt that he made his arguments in an articulate fashion. I simply respectfully disagreed and your motion is respectfully denied, the motion—or objection, rather, motion to reconsider the *Krankel* hearing."

13

The defendant argued his other *pro se* motions, and those were denied. Following arguments by both the State and the defendant, the trial court sentenced the defendant to 30 months of conditional discharge as well as 180 days in jail, though the court ordered the sentence to be stayed pending the appeal.

¶ 37 On January 6, 2020, the defendant filed a motion to reconsider sentence, which was denied. The defendant filed his notice of appeal on February 7, 2020.

¶ 38                                    II. ANALYSIS

¶ 39 The defendant's sole contention on appeal is that the trial court's failure to comply with *Krankel* deprived him of his constitutional right to counsel at critical posttrial stages of his case. In support of this contention, the defendant argues that (1) he was deprived of his right to counsel where the court did not conduct *Krankel* proceedings as soon as he raised *pro se* ineffective assistance of counsel claims, (2) the court erred in accepting his posttrial waiver of his right to counsel where it was not clear and unambiguous and where the court failed to admonish him in accordance with Illinois Supreme Court Rule 401 (eff. July 1, 1984), (3) he was entitled to the appointment of counsel and additional proceedings based on his *pro se* allegations of ineffective assistance of counsel, and (4) the court used the wrong legal standard in evaluating his claims.

¶ 40 As previously stated, the defendant was represented at trial by public defender Fowler. After trial and after defense counsel had filed a motion for new trial, the defendant made several *pro se* filings that raised allegations of ineffective assistance of counsel. After questioning the defendant, the trial court vacated the appointment of the public defender as the defendant's counsel, and new counsel was not appointed for the remainder of the defendant's posttrial proceedings.

14

¶ 41    The sixth amendment of the United States Constitution provides defendants with the right to counsel. U.S. Const., amends. VI, XIV. Further, an indigent defendant is entitled to have counsel appointed for him. *People v. Hughes*, 315 Ill. App. 3d 86, 91 (2000) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)). Our supreme court has reiterated that the right to counsel exists "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected," including posttrial and sentencing proceedings. (Internal quotation marks omitted.) *People v. Dixon*, 366 Ill. App. 3d 848, 851-52 (2006); *Hughes*, 315 Ill. App. 3d at 95. A defendant may waive his right to counsel and proceed *pro se* so long as he does so voluntarily and intelligently. *Dixon*, 366 Ill. App. 3d at 852; Ill. S. Ct. R. 401(a). " 'We review the trial court's finding that defendant waived his right to counsel under an abuse of discretion standard,' " and in light of the overall context of the proceedings. *Dixon*, 366 Ill. App. 3d at 852 (quoting *Hughes*, 315 Ill. App. 3d at 91); see *People v. Phillips*, 392 Ill. App. 3d 243, 260 (2009).

¶ 42    Under *Krankel* and its progeny, the trial court is obligated to inquire into a defendant's *pro se* posttrial claims that he was denied the effective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11; *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). This inquiry, which is sometimes referred to as a "preliminary *Krankel* inquiry" (*People v. Jolly*, 2014 IL 117142, ¶ 28), requires the court to ascertain the nature of defendant's ineffective assistance of counsel claims and evaluate their potential merits (*People v. Mays*, 2012 IL App (4th) 090840, ¶ 58). To understand the factual bases of defendant's allegations, it is proper for the court to question both trial counsel and defendant. *Ayres*, 2017 IL 120071, ¶ 12. If defendant's allegations show that trial counsel may have neglected defendant's case, the court should appoint new counsel and set the matter for a hearing. *Id*. ¶ 11; *Moore*, 207 Ill. 2d at 78. If the court determines that the claims lack merit or pertain only to matters of trial strategy, however, then no further action is required.

15

*Id*. A preliminary *Krankel* inquiry "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

¶ 43 A defendant's *pro se* claim lacks merit if it is misleading, conclusory, or legally immaterial or fails to " 'bring to the trial court's attention a colorable claim of ineffective assistance of counsel.' " *People v. Cook*, 2018 IL App (1st) 142134, ¶ 104 (quoting *People v. Johnson*, 159 Ill. 2d 97, 126 (1994)). "The court may, of course, rely on its own legal knowledge of what does and does not constitute ineffective assistance." *Mays*, 2012 IL App (4th) 090840, ¶ 57. The court may also base its evaluation of defendant's claims on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79.

¶ 44 "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id*. at 78. Whether the court properly conducted a preliminary *Krankel* inquiry is a legal question reviewed *de novo*. *Jolly*, 2014 IL 117142, ¶ 28. If, however, the court conducted the *Krankel* inquiry properly and reached a determination on the merits, we will reverse only if its action was manifestly erroneous. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Id.*

¶ 45 The record reveals that the defendant's arguments on appeal are without merit. First, we will not hold the trial court's decision to research *Krankel* and its progeny and thoughtfully consider whether the defendant's *pro se* claims triggered its duty to inquire into the allegations against it. Further, the defendant's several *pro se* filings, including a motion to continue requesting that the court first address his motion to vacate in case No. 10-CF-176 and the motion to suppress in this case, contributed to the delay in the court being able to address the defendant's ineffective

16

assistance claims. Additionally, the defendant raised additional claims implicating *Krankel* up until August 27, 2019, less than two months before the court's preliminary *Krankel* hearing. Thus, we find nothing improper about the timing of the court's preliminary *Krankel* hearing.

¶ 46 The record also indicates that the defendant unequivocally waived his right to counsel in open court and clearly understood that he would be proceeding *pro se* as evidenced by the trial court's repeated questioning on the matter over several different hearings. After the defendant expressed his wish that the appointment of the public defender's office as his counsel be vacated, the court made sure he understood that the next step would be sentencing on a Class 4 felony, for which the court had previously explained the penalties. We conclude that the court did not abuse its discretion in finding that the defendant waived his right to counsel during his posttrial proceedings. The court conducted several inquiries and allowed the defendant time to develop his allegations against trial counsel while the court considered whether they triggered a preliminary *Krankel* inquiry. Therefore, the record does not support the defendant's contention that he was deprived of counsel during his posttrial proceedings.

¶ 47 Moreover, to the extent that the defendant argues the trial court deprived him of counsel during the *Krankel* hearing by not appointing new counsel to represent him, we must disagree. As previously stated, the court first makes an inquiry to determine the merits of a defendant's ineffective assistance of counsel claim. Only when the court determines that there was possible neglect of defendant's case is it required to appoint counsel. See *Ayres*, 2017 IL 120071, ¶ 11. Since the court here determined that the defendant's claims were unfounded, it appropriately did not appoint new counsel to argue those claims. Nevertheless, we note that, even after the court found the defendant's claims to be without merit, the court once again advised him that he had a

17

right to counsel, he could hire counsel, or he could request that the court appoint counsel to represent him at the sentencing hearing.

¶ 48    We now turn to the defendant's argument that the trial court employed the wrong legal standard during its preliminary *Krankel* inquiry.  Specifically, he contends that the court "held [him] to a higher burden and required him to *prove* that counsel was ineffective pursuant to *Strickland v. Washington*, when [he] was only required to show that counsel *possibly neglected* his case."  (Emphases in original.)  For the following reasons, we disagree that the court committed error here.

¶ 49    The trial court's finding that the defendant's claims lacked merit as they did not raise constitutional issues, did not prejudice the defendant, and involved matters of trial strategy does not automatically mean that the court conducted an improper hearing.  As the State notes, our supreme court has stated, on multiple occasions, that, following a preliminary *Krankel* hearing, a trial court may decline to appoint new counsel if the defendant's claim is meritless.  See, *e.g.*, *People v. Jocko*, 239 Ill. 2d 87, 92 (2010) (no new counsel is required where defendant's claim "lacks merit"); *People v. Simms*, 168 Ill. 2d 176, 199 (1995) (no new counsel where defendant's claim was "meritless," because it involved "matters of trial strategy which may not be second-guessed"); *People v. Sims*, 167 Ill. 2d 483, 518 (1995) (if "there is no validity to the defendant's claim" or "it pertains to a matter of trial strategy," then new counsel need not be appointed).  Further, the docket entry indicating that the claims "[had] merit, ostensibly and superficially, to justify a preliminary, non-adversarial, hearing on the motion" simply demonstrated that the court correctly found the defendant had raised *pro se* ineffective assistance of counsel claims sufficient to trigger the court's duty to conduct a preliminary *Krankel* inquiry.

18

¶ 50 The defendant's argument is further undermined by our supreme court's recent decisions in *People v. Roddis*, 2020 IL 124352, and *People v. Jackson*, 2020 IL 124112. In *Roddis*, the supreme court held that, in a *Krankel* hearing, courts may properly consider both the factual and legal merits of a defendant's ineffective assistance claim. *Roddis*, 2020 IL 124352, ¶ 70. In so doing, the court noted that its oft-quoted language from *Moore* that a trial court need not appoint counsel if defendant's claim "lacks merit" (*Moore*, 207 Ill. 2d at 77-78) has never been interpreted by the supreme court as distinguishing between factual and legal merit. *Roddis*, 2020 IL 124352, ¶ 55. The court reiterated that, at a *Krankel* hearing, a trial court may base its determination of the merits of a defendant's ineffective assistance claims on its own knowledge of counsel's trial performance and emphasized, "[t]he trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect." *Id.* ¶ 56.

¶ 51 The *Roddis* court concluded:

> "We find that, even in preliminary *Krankel* inquiries, a trial court must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel. This serves both the ends of justice and judicial economy." (Emphasis in original.) *Id.* ¶ 61.

See also *Jackson*, 2020 IL 124112, ¶¶ 101-05 (similarly finding). Thus, *Roddis* and *Jackson* are fatal to the defendant's argument, as framed on appeal, that the trial court improperly considered the legal merits of his ineffective assistance claims during the *Krankel* hearing.

¶ 52 We note, however, that the defendant's briefs discuss the merits of one of his ineffective assistance claims. To the extent that he also suggests that the court erred in determining his claim did not show possible neglect, we would again disagree. As previously noted, it is not improper for the court to reject claims that are clearly based on counsel's application of trial strategy (*Moore*,

19

207 Ill. 2d 68, 77-78), and the defendant's claim here, concerning counsel's decision to not file a motion to suppress the traffic stop, falls squarely into that category. See, *e.g.*, *People v. Janosek*, 2021 IL App (1st) 182583, ¶ 28 (mandate issued Jan. 31, 2022). Further, although a defendant may, theoretically, rebut presumptions of sound strategy in an ineffective assistance claim, the claims here do not reflect neglect of the case or constitute bare assertions of strategy without any substance. See, *e.g.*, *People v. Maya*, 2019 IL App (3d) 180275, ¶ 27. Trial counsel explained that she did not believe a motion to suppress would have been successful, based on her experience, because both Warner's testimony and the police report indicated there was a white line in the middle of the road that the defendant crossed. Although the video did not show the white line or the traffic violation, Warner explained that the video saved the recording only 30 seconds prior to him activating his lights or siren. Further, the court presided over the defendant's trial, observed the evidence presented, and had intimate knowledge of counsel's representation of the defendant throughout the proceedings.

¶ 53    In sum, viewing the defendant's ineffective assistance of counsel allegations in the context of the entire record on appeal, we conclude that the trial court's preliminary *Krankel* inquiry was proper and supported the court's denial of the defendant's posttrial motions. The court rightfully rejected the defendant's claims based on its firsthand knowledge of counsel's performance during the trial and the fact that the claims related to trial strategy. We find that the court's determination that trial counsel provided effective assistance to the defendant during the pendency of his case was not manifestly erroneous, and the record does not reveal that the appointment of counsel was necessary for investigation into the defendant's claims.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, the judgment of the circuit court of Effingham County is hereby

affirmed.


¶ 56    Affirmed.